JOSEPH R. CURL, *Admr. v.* H. EDGERTON VANCE *et al.*

(No. 7695)

Submitted April 10, 1935. Decided June 10, 1935.

*Erskine, Palmer & Curl,* for appellant.
*Schmidt, Hugus & Laas,* for appellees.

MAXWELL, JUDGE:

This is an appeal from a decree, rejecting the tender of a third amended bill. The suit was instituted, January 4, 1929, by John W. Garland against H. Edgerton Vance, as executor

of the estate of James N. Vance, deceased, and others. A demurrer to the original bill, filed at the succeeding March Rules, was sustained April 18, 1930. Pending objections to an amended bill tendered June 6, 1930, a second amended bill was filed December 30, 1930. The ruling of the circuit court sustaining a demurrer to the second amended bill, June 20, 1931, was certified under section 2, article 5, chapter 58, Code 1931. The mandate of this Court refusing to docket the certificate was issued September 21, 1931, and recorded in the office of the clerk of the circuit court October 23, 1931. November 21, 1931, the plaintiff, John W. Garland, died, and on May 23, 1932, Joseph R. Curl was appointed administrator of his estate. On November 10, 1932, the suit was revived in the name of Curl, as administrator. He thereupon tendered a third amended bill. The objection of defendants to the filing thereof was sustained, and the suit dismissed.

The third amended bill, elaborately drawn, charges, substantially, that from 1905 to 1911, Garland invested nearly one million dollars in the organization and operation of telephone companies in Pennsylvania; that James N. Vance, Samuel W. Harper, William C. Handlan, John A. Howard and others, in 1908, organized a number of affiliated telephone companies in West Virginia to compete with the Bell Telephone System; that in 1909, the National Telephone Corporation of West Virginia, one of the corporations organized by them, acquired the controlling interest in the capital stock of eleven other independent companies, operating in West Virginia, Pennsylvania and Ohio, in which Vance had invested large sums of money; that in order to finance the operation of the several companies, Vance and his associates, as directors and managers of the National Company, caused it to execute a deed to Metropolitan Trust Company of New York, trustee, to secure a collateral bond issue by the grantor of ten million dollars ($10,000,000.00), and thereafter deposited with the trustee all of the stocks of the subsidiaries and other collateral to secure the payment of $2,680,000.00 of bonds issued under the trust to Vance and his associates; that in 1910, the National Company, not being able to meet its financial obligations, was, by suit instituted at the instance of Vance and his

associates, placed in the hands of receivers; that, pending the receivership, Vance and Robert C. Hall, who was also interested with him in the promotion of independent telephone companies, on February 2, 1911, entered into a written contract (exhibited with the pleading), which recites that the parties were mutually interested as stockholders and creditors of the National Company and desirous of uniting in the purchase of the whole or part of its bonds and obligations and providing for the management, use and distribution thereof; and stipulates (1) that the parties shall purchase in equal parts $629,300.00 par value of the bonds of the National Company then owned by William Flinn and George H. Flinn of Pittsburgh; (2) that Hall shall, "if called upon," purchase other bonds of the National Company to the amount of $37,300.00 at forty per cent of their par value; (3) that the parties shall contribute "to the pool to be formed by the property herein agreed to be purchased, all stock of the National Telephone Corporation, including the claim of R. C. Hall for 5,500 shares of the stock of the Pittsburgh & Allegheny Telephone Company or the proceeds thereof, without cost to the pool or credit to the party contributing, and that" Vance "shall turn over to the pool all claims against the National Telephone Corporation except a claim amounting to approximately $127,000.00 for which he holds" its notes; that the parties shall purchase, "at prices and upon terms and conditions to be mutually agreed upon," a note of the National Company for $235,000.00 held by the Metropolitan Trust Company and secured by bonds of the maker in the sum of $670,000.00, and a note of the National Company for $15,000.00 held by the Hudson Trust Company of New York and secured by bonds of the maker in the amount of $50,-000.00; (4) that the contract shall continue for three years, unless extended or sooner terminated by consent of the parties in writing; and that any controversy or disagreement between the parties thereunder shall be referred to Garland and his decision thereon accepted as final. An addendum to the contract, signed by Vance, Hall and Garland, provides that in consideration of services already rendered by Garland in anticipation of the contract and his agreement to use his best

endeavor for its successful execution, he shall share one-third of the profits and losses.

It is further charged that Garland expended great effort and large sums of money in an endeavor to perform his part of the contract by obtaining options on notes, secured by stock in the National Company, and by interesting persons in the proposed reorganization of the corporation; that on November 20, 1911, Vance and his associates caused a written contract (exhibited with the pleading) to be entered into between Cyrus Huling as their agent and Central District Printing and Telegraph Company, a subordinate affiliate of the Bell System, for sale of the telephone properties in Ohio and West Virginia belonging to Vance and his associates at the price of $4,150,000.00; that the contract provided for the repayment to Vance, from the purchase price of the holdings, his investments in the stocks and bonds of, and loans to, the National Company and its subsidiaries; that Vance was to receive also from the sale, as profits, all payments by the purchaser in excess of the amounts invested by him and his associates in the bonds of the National Company and the stocks and properties of its subsidiaries; that on February 13, 1912, Hall, at the instance of Vance, addressed a letter to Garland stating:

"Referring to the contract entered into on the 2nd day of February, 1911, between J. N. Vance and myself, to which you were an interested party:

"I am advised by Mr. Vance, General Riley and Mr. Lawrence E. Sands that negotiations are now pending for the sale of the properties of the National Telephone Corporation, or the reorganization of the securities governing them—a portion of which securities are enumerated and included in above referred to contract.

"I am advised by each of these gentlemen, and especially by Mr. Vance, that this contemplated sale or reorganization will produce no profit to anyone whatsoever, but that he is especially desirous of relieving himself of any guaranties or obligations or notes of any nature, and for this reason he has persuaded me to dissolve, rescind and set aside the above contract, the first condition of this arrangement being that I secure the release of all interest

you may have, directly or indirectly, in said agreement.

"While I realize that you have spent considerable time and money in trying to accomplish the reorganization of these same properties, I believe that you will not refuse to go along with us on this proposition, inasmuch as there is to be no profit, and trust that you will accede to this request of Mr. Vance, in which I earnestly join."

That Garland, having full faith and confidence in the integrity, truthfulness and uprightness of Vance and associates, and relying upon the statements set forth in the letter as being true, on the same day, replied as follows:

"I have your letter of this date, asking for a release of my interest in the contract dated February 2nd, 1911, between J. N. Vance, yourself and myself.

"Under all the circumstances, and inasmuch as the people mentioned by you have stated specifically that there is no profit to be made on the sale or reorganization of the properties as suggested by you, or any modification thereof, I am willing to rescind the contract under the conditions named by you.

"As I am leaving today for England and will not have an opportunity to see you or communicate with Mr. Vance, I am sending you this letter in duplicate, so that you may hand one copy to Mr. Vance."

That after securing the substitution of Commonwealth Trust Company of Pittsburgh in lieu of Metropolitan Trust Company, as trustee in the trust deed, a suit to foreclose the trust deed was instituted by Commonwealth Trust Company, at the instance of Vance and his associates, in the United States District Court for the Northern District of West Virginia; that Vance proved his claims, against the National Company, before a master commissioner, and the property conveyed by the trust deed was purchased at a sale in the cause, soon after the death of Vance in June, 1913, in the name of J. H. Vercoe, on behalf of the estate of Vance and his former associates; that the properties covered by the contract of sale of November 20, 1911, between Huling and the Central District Printing and Telegraph Company were delivered in accordance

with its terms and Vance and his executor, H. Edgerton Vance, received all of the money he had invested in and loaned to the National Company and its subsidiaries and more than $100,000.00 additional; that Vance and his associates, Lawrence E. Sands and Samuel W. Harper, after the "conditional release" of his interest, on February 13, 1912, caused Garland to believe that the bonds of the National Company, owned by Vance, were held by him at the time the claims against it were proved before the master commissioner in the foreclosure suit, and that he had realized less than thirty per cent of the par value thereof; that Garland, through E. A. Howard, in 1928, first learned of the contract between Cyrus Huling and Central District Printing and Telegraph Company, of the purchase of the properties at the judicial sale by Vercoe, for the benefit of the Vance estate and his former associates in fulfillment of the contract, or the receipt by Vance or his estate of any profits from his investments in the National Company and its subsidiaries; that Garland was without means of information and could not by the exercise of reasonable diligence have sooner discovered the facts.

The bill prays for an accounting and judgment against the Vance estate for one-third of the profits from the sale by him of the bonds of the National Company and the stocks and properties of its subsidiaries.

In written opinions of the circuit court apropos of the demurrer to the second amended bill and the objection to the filing of the third, reference is made to the case of *Vance* v. *Harper*, 109 W. Va. 747, 156 S. E. 118, wherein this Court affirmed the action of the circuit court of Ohio County in finding for the defendant and dismissing the bill. We understand it to be the trial court's position that the record in that case discloses that neither James N. Vance nor his estate realized any profits from the matters hereinabove recited, and that therefore there is no basis for an accounting as demanded by the plaintiff herein. On that ground and because of supposed laches on the part of plaintiff's decedent, the objection to the filing of the third amended bill was sustained.

The principal reliance of the plaintiff in the case of *Vance* v. *Harper* was a memorandum, in the handwriting of James

N. Vance, found among his papers soon after his death in 1913. The memorandum reads: "April 11, 1913. Mr. Harper said that the profit on the Inter-State Telephone Co. would be about $3,000 1/3 belonging to Mr. Huling and 2/3 belonging to me. Of the National about $1,000,000 would be profit when all cleaned up leaving the P. & A. of Pittsburgh as velvet. (Signed) J. N. Vance." The essence of the holding of this Court in that case was that the evidence was not sufficient to establish a trust relationship between James N. Vance and his son-in-law, Samuel W. Harper. We approved the result reached by the learned trial chancellor. In that case, the Vance memorandum had only the standing of a self-serving declaration. Here, the claim asserted is not in favor of the Vance estate, as in the said case, but is against the Vance estate. In this case, therefore, the memorandum has the probable status of a declaration against interest, its probative value to be determined in due course. True, the memorandum is not an averment by the elder Vance that the profits therein mentioned had been realized, but, in effect, that they were anticipated. The memorandum, on its face, is not entirely clear. In its first sentence, Harper is quoted with respect to Inter-State Telephone Company. In the second sentence, there may be doubt as to whether Harper is being quoted. Query: Is the statement in the second sentence made by Vance on his own knowledge or on the representation of Harper?

The circuit court seems to take the position that because the Vance estate failed to recover of Harper there were no profits to said estate. We are unable to accept that conclusion. The transactions in which these parties were interested involved a number of companies and many dealings in large affairs. Maybe there were profits to the Vance estate other than those claimed in the *Vance-Harper* case. The plaintiff vigorously asserts that Vance did receive large profits. It must be borne in mind, too, that Garland was not a party to the said suit. His personal representative is not bound by the result thereof. It would seem that the plaintiff should have opportunity to develop the facts.

The charge of laches as against the allegations of the third

amended bill, in our opinion, should not be resolved against the plaintiff, but should await proof. ''Where the question of laches can better be determined at the hearing on the merits, the court may refuse to dispose of it upon demurrer.'' 21 Corpus Juris, p. 437. (The motion to reject the third amended bill was tantamount to demurrer.) Many years elapsed between the action of Garland February 13, 1912, conditionally releasing his interest in the contract of February 2, 1911, between himself, Vance and R. C. Hall, and the institution of this suit, but lapse of time alone does not constitute laches.

It is alleged by the plaintiff that Garland executed the release on the basis of the representation made to him by his associate Hall at the instance of his associate James N. Vance that there were to be no profits. He further alleges that he received no information to the contrary until the year 1928. The third amended bill is framed on the theory that Garland's action was based on representation made to him by one or both of his associates, and that he had the right to treat such representation as a verity and to place full reliance thereon. On that theory he was under no legal obligation to conduct inquiries, secret or otherwise, to determine whether those who bore to him a fiduciary relationship were telling him the truth. Where men are associated in a transaction, the utmost good faith must be exercised by each toward the others. Whenever in confidential relationship there are statements of fact, they must be matters of verity to be accepted as such. If the rule were otherwise, associations in business would be impossible and confidential relationship a mockery—a pitfall to him who would be honest and a snare in the hands of him who valueth not integrity. It is not required that there be constant vigilance to test or prove the honor of an associate.

Facts are alleged tending to show that Vance and Hall aggressively and fraudulently concealed the truth from plaintiff's decedent. Laches and the statute of limitations ''cannot prevail where the relief sought is grounded on a charge of secret fraud, and it appears that the suit was commenced within a reasonable time after the evidence of the fraud was discovered.'' *Meader* v. *Norton,* 11 Wall. 442, 20 L. Ed. 184.

Consult: *Newberger* v. *Wells,* 51 W. Va. 624, 42 S. E. 625; *Plant* v. *Humphries,* 66 W. Va. 88, 66 S. E. 94, 26 L. R. A. (N. S.) 558; *Bailey* v. *Glover,* 21 Wall. 342, 22 L. Ed. 636.

These considerations lead us to the conclusion that by the third amended bill the plaintiff presents a showing which entitles him to a determination of the matters involved upon the proof.

Therefore, we reverse the decree of the trial court and remand the cause for further proceedings.

*Reversed and remanded.*